DAVID CHIU, State Bar #189542
City Attorney
JENNIFER E. CHOI, State Bar #184058
Chief Trial Deputy
THOMAS J. TARKOFF, State Bar #160994
KATHERINE B. BEARMAN, State Bar #280561
ALISTAIR D. BLACKLOCK, State Bar # 339105
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California 94102-5408
Telephone:      (415) 554-3962 [Tarkoff]
Telephone:      (415) 554-4256 [Bearman]
Telephone:      (415) 554-3888 [Blacklock]
Facsimile:      (415) 554-3837
E-Mail:         tom.tarkoff@sfcityatty.org
E-Mail:         kate.bearman@sfcityatty.org
E-Mail:         alistair.blacklock@sfcityatty.org

Attorneys for Defendants
ROBERT GLENN, JACQUELINE HERNANDEZ,
and KAYLIN STEWART

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL ROSAS, an individual, | Case No. 3:23-CV-04913-SK |
| Plaintiff, | **DEFENDANTS' TRIAL BRIEF** |
| vs. | |
| ROBERT GLENN, in his individual capacity as a police officer for the SAN FRANCISCO Police Department; JACQUELINE HERNANDEZ in her individual capacity as a police officer for the SAN FRANCISCO Po1ice Department; KAYLIN STEWART in her individual capacity as a police officer for the SAN FRANCISCO Police Department; and DOES 1-50, inclusive., | Trial Date:      April 7, 2026 |
| Defendants. | |

## **TABLE OF CONTENTS**

INTRODUCTION AND FACTUAL BACKGROUND ...............................................................1

PROCEDURAL HISTORY ..............................................................................................3

ARGUMENT .................................................................................................................3

    I.    NO DEFENDANT USED EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT ...............................................................................3

    II.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ......................5

    III.  THE EXTENT OF PLAINTIFF'S DAMAGES ARE DISPUTED ........................7

## INTRODUCTION AND FACTUAL BACKGROUND

In the early morning hours of September 25, 2021, Palace Hotel security supervisor Steven Alcairo received an alert about a disturbance in a guest room. Mr. Alcairo went to the room and spoke with Plaintiff Samuel Rosas's partner, John Stephens, who was staying at the hotel with Mr. Rosas. Mr. Alcairo learned that there had been a physical altercation between Mr. Rosas and Mr. Stephens. The altercation had spilled into the hallway, and Mr. Stephens had been yelling for help. Mr. Stephens told Mr. Alcairo that Mr. Rosas had hit him on the head and that he wanted Mr. Rosas to leave. Mr. Stephens also told Mr. Alcairo that Mr. Rosas had committed acts of domestic violence against him twice in the past, and that one of the past incidents had required police intervention. Because Mr. Stephens was the registered guest at the Palace Hotel, Mr. Alcairo told Mr. Rosas that he had to leave. Mr. Alcairo stood by while Mr. Rosas collected his belongings. He then escorted Mr. Rosas from the room and to the lobby. Mr. Stephens remained in the hotel room.

Over the course of approximately one hour, Mr. Alcairo told Mr. Rosas numerous times that he must leave the hotel. Mr. Alcairo also explained more than three times that he would need to call the police for criminal trespassing if Mr. Rosas did not leave. Mr. Rosas refused to leave and, at one point, said to Mr. Alcairo, "Fuck it. I'll run the risk of being arrested." Mr. Rosas also made multiple attempts to return to Mr. Stephens' room, including by running up the stairs and attempting to use the elevator. Because Mr. Rosas did not have a hotel room key, his attempts were unsuccessful. Given Mr. Rosas's conduct and his refusal to leave the hotel, Mr. Alcairo eventually contacted the police.

Defendant Sergeant Robert Glenn[1] was the first officer to arrive, followed by Defendant Officers Jacqueline Hernandez and Kaylin Stewart.[2] When the officers arrived at the hotel and approached Mr. Rosas, they knew the following:

1.   Mr. Rosas had been staying at the hotel with a registered guest (Mr. Stephens);

2.   The registered guest told hotel security that Mr. Rosas had "struck" him;

3.   No weapons were involved;

---

[1] Glenn's rank was Officer when the incident occurred; he was promoted to Sergeant during the years that have passed since the incident.

[2] Kaylin Stewart is now Kaylin Orlando.

Defendants' Trial Brief                              1
Case No. 23-CV-04913-SK

4. The registered guest wanted Mr. Rosas to leave but was refusing to press charges;

5. The hotel had ordered Mr. Rosas to leave;

6. Mr. Rosas was refusing to leave.

When Sgt. Glenn first approached Mr. Rosas, Mr. Rosas was speaking on his cell phone with Mr. Stephens. Sgt. Glenn asked Mr. Rosas several times to hang up the phone and talk to him. Mr. Rosas ignored these requests. Eventually Mr. Rosas hung up the phone, and all three officers spoke with him. They explained, repeatedly, that the hotel was refusing him service and he had to leave. They explained, repeatedly, that he was trespassing. They explained, repeatedly, that he was not a registered guest. And they explained, repeatedly, that if Mr. Rosas did not leave the hotel, he would be arrested and taken to jail. Overall, the officers made at least eight attempts to convince Mr. Rosas to leave. Mr. Rosas refused to leave and instead argued with the officers. Sgt. Glenn asked Mr. Alcairo if he would be willing to sign a citizen's arrest form for trespassing. Mr. Alcairo said he would.

After Mr. Alcairo signed the citizen's arrest form, Sgt. Glenn told Mr. Rosas two more times that his options were to get up and leave or go to jail. When Mr. Rosas continued refusing to leave, Sgt. Glenn told him to "stand up and turn around." Simultaneously, he grabbed Mr. Rosas's arms and tried to stand him up. As the body-worn camera video shows, Mr. Rosas tensed his arms and began to resist the officers' attempts to place him in handcuffs. Officers Hernandez and Orlando grabbed onto his arms and there was a struggle. Sgt. Glenn took Mr. Rosas to the floor and landed on his back with Mr. Rosas on top of him. Officer Hernandez also fell to the floor (presumably because of Mr. Rosas's continued resistance). Even after he was on the floor, Mr. Rosas continued to struggle and tried to get up on his hands and knees. Overall, it took 45 seconds for three officers to put Mr. Rosas in handcuffs. Officer Hernandez then placed Mr. Rosas's legs into a control hold, at which point she noticed that Mr. Rosas had injured his ankle. The officers immediately called for paramedics and Mr. Rosas was treated through jail medical at Zuckerberg San Francisco General Hospital. At the hospital, Mr. Rosas tested positive for methamphetamine and fentanyl, although it is unknown to what extent he was under the influence during the incident.

**PROCEDURAL HISTORY**

Mr. Rosas filed this lawsuit on September 25, 2023. In his Complaint, he asserts two causes of action under 42 U.S.C. § 1983: one for excessive force in violation of the Fourth Amendment against each individual Defendant officer, and one for unlawful seizure (lack of probable cause/reasonable suspicion) in violation of the Fourth Amendment against each individual Defendant officer. Mr. Rosas does not assert a *Monell* claim.

Defendants answered the Complaint and did not file a summary judgment motion.

Mr. Rosas has represented that, before trial, he will dismiss the unlawful seizure claim with prejudice and stipulate that at all relevant times, Defendants had probable cause to arrest him for criminal trespassing.

**ARGUMENT**

**I.    NO DEFENDANT USED EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT**

Under the Fourth Amendment, a police officer may use only such force as is "objectively reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 388 (1989). In assessing whether an officer's actions were reasonable, courts consider: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (quoting *Graham*, 490 U.S. at 397). Courts "must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Williamson*, 23 F.4th at 1151 (cleaned up). The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, and police officers "are not required to use the least intrusive degree of force possible." *Williamson*, 23 F.4th at 1151 (cleaned up).

Many factors can be considered in determining whether a use of force was reasonable, including, but not limited to, (1) whether the plaintiff posed an immediate threat to the safety of officers or others, (2) whether the plaintiff was actively resisting arrest, (3) whether the plaintiff was

cooperating with the police officers, (4) changing circumstances throughout the encounter, (5) the extent of the plaintiff's injury, (6) the officers' efforts to limit the use of force, (7) whether it was practical for the officers to warn that they would use force and whether they gave a warning, and (8) whether the officers were responding to a domestic violence incident. *See*, *e.g.*, Ninth Circuit Manual of Model Civil Jury Instructions, 9.27; *Arpin v. Santa Clara Valley Transp. Auth.*, 261 F.3d 912, 921-22 (9th Cir. 2001) (using physical force to handcuff the plaintiff was objectively reasonable where the plaintiff "refused to cooperate and provide her . . . identification when requested," the officer warned her that "she would be arrested if she did not cooperate," the plaintiff continued refusing to cooperate, and, when the officer attempted to handcuff the plaintiff, she "stiffened her arm and attempted to pull free").

Here, Defendants used reasonable force to overcome Mr. Rosas's active resistance to a lawful arrest. The officers knew Mr. Rosas had previously struck a registered hotel guest. It is undisputed that the officers had probable cause to arrest Mr. Rosas for criminal trespass. The officers spoke to Mr. Rosas for three minutes, explaining why he must leave and giving him several opportunities to leave rather than be arrested. The officers told Mr. Rosas several times that he would be arrested or go to jail if he did not leave the hotel. There is no evidence that Mr. Rosas was unable to understand the officers. Defendants' expert in use of force, Jeffrey Martin, will testify that the officers used proper de-escalation tactics that complied with their training.

Furthermore, Mr. Alcairo told Sgt. Glenn upon his arrival that Mr. Rosas wanted to go upstairs and reconcile with the guest whom he had struck. The officers also observed Mr. Rosas speaking on the phone with Mr. Stephens and begging Mr. Stephens to allow him back upstairs. We will argue this evidence supports a reasonable inference that the officers knew they could be dealing with a domestic violence incident, which can be "particularly dangerous." *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (citation omitted).

After the officers went hands-on, it is undisputed that Mr. Rosas tensed his arms—his first of multiple actions taken to resist the officers' attempts to place him in handcuffs. Defendants will argue that the body-worn camera video shows Mr. Rosas swinging his arms and resisting. Mr. Alcairo, who witnessed the arrest, will offer similar testimony. Sgt. Glenn therefore had to take Mr. Rosas to the

Defendants' Trial Brief
Case No. 23-CV-04913-SK

4

ground. Even after he was on the ground, Mr. Rosas continued to struggle. Although Mr. Rosas sustained a fractured ankle during the takedown or struggle on the ground, Defendants' expert Mr. Martin will testify that Sgt. Glenn's takedown method was proper because Mr. Rosas was actively resisting and posed a safety threat to the officers. Furthermore, force can be objectively reasonable even when it causes a serious injury. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 383 (2007) ("Whether or not Scott's actions constituted application of 'deadly force,' all that matters is whether Scott's actions were reasonable."); *Sabbe v. Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807, 828 (9th Cir. 2023) (police officers' use of deadly force against decedent did not violate the Fourth Amendment); *Miller v. Clark Cnty.*, 340 F.3d 959, 968 (9th Cir. 2003) ("Notwithstanding the serious injuries to Miller, there was no use of excessive force under the circumstances.").

Mr. Rosas's entire case rests on two theories: the officers did not properly engage in de-escalation tactics and Sgt. Glenn purportedly used a chokehold to restrain Mr. Rosas. Defendants will present evidence, both through Mr. Martin and Defendants' 30(b)(6) witness from the San Francisco Police Department, that all three officers followed SFPD protocols concerning de-escalation and that Sgt. Glenn acted within the use of force policy. That policy allows officers to apply pressure to a suspect's neck or throat in exigent circumstances, defined as "when an officer has specific and articulable facts that a particular action . . . was performed by an officer due to concerns of the person's safety, the safety of others or the safety of the involved officer(s)."

Sgt. Glenn will testify that he did not intentionally put his arm or hand around Mr. Rosas's neck; rather, he did so unintentionally while trying to get Mr. Rosas under control and keep him from hurting himself or others. He removed his arm and hand from Mr. Rosas's neck within a few seconds and never put pressure on Mr. Rosas's trachea. Mr. Rosas does not claim he experienced any neck injury. Mr. Martin will testify that Sgt. Glenn did not use a chokehold as defined in SFPD's use of force policy, and that when Sgt. Glenn put his arm and hand on Mr. Rosas's neck, he was using appropriate force in light of active resistance and threats to officer safety.

## II.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Defendants are entitled to qualified immunity. Even if a constitutional violation occurred (it did not), government officials are entitled to immunity unless their conduct violated a clearly

established right. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). It "protect[s] all but the plainly incompetent or those who knowingly violate the law" from individual liability. *Id.*

"Plaintiff 'bears the burden of showing that the rights allegedly violated were clearly established'" by precedent. *Singh v. City of Phoenix*, 124 F.4th 746, 750 (9th Cir. 2024) (citations omitted). "[P]recedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citation omitted). A right is clearly established only if "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 980-81 (9th Cir. 2025) (citations omitted). The Supreme Court has repeatedly "stressed the need to 'identify a case where an officer *acting under similar circumstances* . . . was held to have violated the Fourth Amendment.'" *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (citation omitted) (emphasis added); *see also, e.g., al-Kidd*, , 563 U.S. at 742 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (citation omitted).

Here, Mr. Rosas cannot show a clear rule that it was unconstitutional for any of the officers to take him to the ground, where Mr. Rosas repeatedly ignored the officers' orders, refused to cooperate with the officers' efforts to handcuff him, tensed his arms, and swung his body around to try to escape the officers' grasp. Courts in this circuit have held that takedowns in similar circumstances are objectively reasonable. *See, e.g., LeSueur v. Glendale Police Dep't*, No. 22-16325, 2024 WL 1342607, at *1 (9th Cir. Mar. 29, 2024) (affirming summary judgment for police officer on excessive force claim where officers knew the plaintiff had been behaving erratically and was suspected of arson, the plaintiff refused to comply with repeated orders to take her hands out of her pockets, and the plaintiff "was first told to take her hands out of her pockets at least seven seconds before she was tackled, giving her more than sufficient opportunity to comply with that command"); *Smith v. Chino Valley, Town of*, No. CV2108009PCTMTLJZB, 2023 WL 5000631, at *11 (D. Ariz. Aug. 4, 2023), aff'd sub nom. *Smith v. Town of Chino Valley*, No. 23-2142, 2025 WL 817422 (9th Cir. Mar. 14, 2025)

(no clearly established right for "an intoxicated and/or mentally unstable 6-foot, 260-pound man not to be thrown to the ground with sufficient force to fracture his knee when the subject verbally refuses to be handcuffed and then physically resists two officers' attempts to pull his hands together"); *Dodakian v. Butters*, No. CV2101184PHXMTLESW, 2023 WL 2585293, at *5 (D. Ariz. Mar. 21, 2023), aff'd, No. 23-15484, 2024 WL 1299991 (9th Cir. Mar. 27, 2024) (it is not clearly established that an "officer's use of force is unconstitutionally excessive when: the officer grabs a suspect's arm, pushes a suspect to the ground using a leg sweep maneuver, and applies pressure to the suspects arms and body while lying face-up on the ground to restrain and handcuff them, where the suspect repeatedly ignored and acted contrary to the officer's instructions, and then verbally and physically resisted the officer's efforts to handcuff them").

Nor can Mr. Rosas show a clear rule that it was unconstitutional for Sgt. Glenn to accidentally put his arm and hand on Mr. Rosas's neck for mere seconds during a struggle on the floor of the hotel, where Mr. Rosas had initially landed on top of Sgt. Glenn, tried to get up onto his hands and knees, continued to fight three officers' efforts to handcuff him, and sustained no injury to his neck.

## III.    THE EXTENT OF PLAINTIFF'S DAMAGES ARE DISPUTED

Mr. Rosas suffered an ankle fracture that required surgery. His expert in orthopedic surgery will testify that Mr. Rosas now has chronic ankle pain and will develop arthritis, which will interfere with his activities of daily living and likely require future surgery. Defendants' expert in orthopedic surgery will testify that it is speculative to conclude Mr. Rosas will develop arthritis. He will also testify that apart from follow-up visits and physical therapy, Mr. Rosas does not need future treatment. And the evidence will show that Mr. Rosas has so far not obtained regular follow-up visits or physical therapy—but he has been in jail for significant amounts of time since the incident.

///

///

///

Defendants' Trial Brief                                           7
Case No. 23-CV-04913-SK

4916-1311-6304, v. 1

Mr. Rosas also claims the incident has caused sleep disturbance, depression, anxiety, and PTSD. He is not making a wage loss claim.

DATE: February 26, 2026

DAVID CHIU
City Attorney
JENNIFER E. CHOI
Chief Trial Deputy
THOMAS J. TARKOFF
KATHERINE B. BEARMAN
ALISTAIR D. BLACKLOCK
Deputy City Attorneys

By: */s/ Katherine B. Bearman*
KATHERINE B. BEARMAN

Attorneys for Defendants
ROBERT GLENN, JACQUELINE HERNANDEZ, and KAYLIN STEWART